## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARK LEVY, | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STERLING HOLDING COMPANY, LLC, | ) | C.A. No. 00-994 |
| NATIONAL SEMICONDUCTOR | ) | |
| CORPORATION and FAIRCHILD | ) | |
| SEMICONDUCTOR INTERNATIONAL, | ) | |
| INC, | ) | |
|       Defendants. | ) | |
| | ) | |

Jeffrey S. Goddess, Esquire, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware, and Jeffrey S. Abraham, Esquire, Mitchell M.Z. Twersky, Esquire, and David Weinberger, Esquire, of ABRAHAM, FRUCHTER & TWERSKY, LLP, New York, New York. Attorneys for Plaintiff.

P. Clarkson Collins, Jr., Esquire, of MORRIS, JAMES, HITCHENS & WILLIAMS, LLP, Wilmington, Delaware, and Jeffrey L. Moyer, Esquire, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, and Steven B. Feirson, Esquire, and Carolyn H. Feeney, Esquire, of DECHERT LLP, Philadelphia, Pennsylvania, and Paul Vizcarrondo, Jr., Esquire, Michael A. Charish, Esquire, Michael S. Winograd, Esquire, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York. Attorneys for Defendants.

## **OPINION**

February 23, 2007
Wilmington, Delaware

SLEET, District Judge

## I.   INTRODUCTION

On November 28, 2000, the plaintiff Mark Levy ("Levy") filed this shareholder's derivative suit on behalf of the defendant Fairchild Semiconductor ("Fairchild") after making an appropriate demand to the board.  The complaint alleges that defendants National Semiconductor ("National") and Sterling Holding Company ("Sterling") (collectively, the "defendants"), who sit on the Fairchild Board of Directors, purchased Fairchild stocks and then sold those stocks at a profit within six months after purchase.  Levy further alleges that National and Sterling's conduct violated the prohibition on short-swing profits due to insider trading expressed in section 16(b) of the Securities and Exchange Act of 1934 (the "Act").  *See* 15 U.S.C. § 78p(b).

Presently before the court are Levy's, National's, and Sterling's cross-motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c).  For the reasons that follow, the court will grant National's and Sterling's motions for summary judgment and deny Levy's motion for summary judgment.

## II.   BACKGROUND

### A.   Factual Background

National and Sterling are both incorporated in the State of Delaware.  On March 11, 1997, Fairchild was spun off from National pursuant to an Agreement and Plan of Recapitalization (the "Agreement").  The newly-created Fairchild issued three classes of stock to its original equity investors, i.e. National, certain members of Fairchild's management, and Sterling: (1) preferred stock, valued at $1,000 per share with a cumulative dividend rate of 12%; (2) class A common stock, which had voting powers and was valued at $0.50 per share; and (3) class B common stock, which

did not have voting powers and was valued at $0.50 per share. The class A common stock and class B common stock were freely convertible into each other at the election of the shareholder.

The Agreement permitted National and Sterling to retain or purchase stock in Fairchild. At that time, National retained 4,380,000 shares of class A common stock, 5,243,621 shares of class B common stock (after a four-for-one common stock split, which occurred in April 1998), and 11,667 shares of 12% series A cumulative compounding preferred stock. Sterling exercised its rights under the Agreement and purchased, for $58.5 million, approximately 3,553,000 shares of class A common stock, 7,099,000 shares of class B common stock (again, after the April 1998 split), and 53,113 shares of the preferred stock.

In May 1999, Fairchild decided to go public through an initial public offering ("IPO"). When Fairchild interviewed potential underwriters, each of them took the position that Fairchild needed to eliminate its preferred stock in order to accomplish an IPO. In other words, Fairchild was informed that it should undergo a recapitalization in anticipation of its IPO. The recapitalization contemplated that preferred shares would be converted to common stock. Fairchild's certificate of incorporation, however, did not provide for the conversion of preferred stock into common stock. Accordingly, on July 1, 1999, a majority of Fairchild's common and preferred shareholders voted to convert all shares of preferred stock into class A common stock "automatically" upon completion of the IPO. The certificate of incorporation was amended to reflect the reclassification, and also set out a formula for the conversion of the shares.[1]  According to the formula, each share of Fairchild's

---

[1] The conversion of preferred stock to common stock in the reclassification was accomplished by dividing the liquidation value of the preferred stock (i.e. $1,000 per share plus accumulated unpaid dividends) by the price per share at which class A common stock would be offered to the public in the IPO, less the underwriting fees and commissions (i.e. $17.39). The conversion resulted in a 75 to 1 ratio.

preferred stock was worth 75.714571 shares of class A common stock.  As a result, Sterling acquired

4,021,428 shares and National acquired 888,362 shares of common stock in exchange for their

preferred stock.  These acquisitions occurred on August 9, 1999, the date the IPO was completed.

According to the prospectus filed by Fairchild on August 4, 1999, National was the beneficial owner

of 14.8% of class A common stock and 14.9% of class B common stock.  The prospectus also

disclosed that, by 1999, Sterling was the beneficial owner of 48.0% of the class A common stock

and 85.1% of the class B common stock.[2]  Thus, both National and Sterling had stock ownership in

Fairchild exceeding ten percent.

In late 1999, Fairchild planned a follow-on or secondary offering of its common stock.  In

accordance with Fairchild's plan, on January 19, 2000 (with a closing date of January 25, 2000),

Sterling sold 11,115,000 shares of class A common stock and National sold 7,243,360 shares of class

A common stock in the secondary offering for profits of $58,511,777.00 and $14,124,958.00,

respectively.  Both sales were within six months of the time National and Sterling acquired the new

shares of common stock.

### B.      Procedural Background

On November 28, 2000, Levy filed this shareholder's derivative suit against National and

Sterling.  On January 29, 2001, National and Sterling moved to dismiss the complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6).  On February 5, 2002, the court issued a Memorandum and

Order granting the motion to dismiss and holding that Rule 16b-7 exempted the reclassification

transaction at issue.  (D.I. 46.)  Levy appealed the court's decision to the Court of Appeals for the

---

[2] By 1999, Sterling's number of shares had grown to 14,212,000 shares of class A
common stock and 28,396,000 shares of class B common stock.

Third Circuit. On December 13, 2002, the Third Circuit issued an opinion in the matter, reversing this court's decision and holding, under its interpretation of Rule 16b-7, that it could not conclude at the motion to dismiss stage that Rule 16b-7 exempted the reclassification. *See Levy v. Sterling Holding Co.*, 314 F.3d 106, 125 (3d Cir. 2002). The Third Circuit also held that, under its interpretation of Rule 16b-3(d), the exemption afforded could not apply to the reclassification at issue unless the transaction had some connection to a compensation-related function. *Id.* at 124.

National and Sterling subsequently petitioned the Third Circuit for rehearing or rehearing *en banc* on the issue. The Securities and Exchange Commission (the "SEC") joined the petition and filed an *amicus* brief, which urged the court to vacate its opinion. On April 30, 2003, the Third Circuit denied the petition for rehearing or rehearing *en banc*. National and Sterling filed a writ of certiorari with the Supreme Court, which the Court denied on October 14, 2003. *See Sterling Holding Co. v. Levy*, 540 U.S. 947 (2003).

On June 4, 2004, the parties filed the cross-motions for summary judgment that are presently at issue. On June 21, 2004, the SEC disseminated a release titled *Proposed Rule: Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Release Nos. 34-49895; 35-27861; IC-26471, 69 Fed. Reg. 35,982 (the "Proposed Amendments") in an effort to amend Rules 16b-3(d) and 16b-7. On June 25, 2004, National and Sterling filed a motion to stay the proceedings pending final action by the SEC on the Proposed Amendments to SEC Rules 16b-3 and 16b-7. The court issued an Order (D.I. 223) on September 27, 2004, granting the motion and staying the proceedings. On August 3, 2005, the SEC adopted the Proposed Amendments. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-52202, 70 Fed. Reg. 46,080 (Aug. 9, 2005) (the "Amendments").

On August 11, 2005, the court issued an Order (D.I. 236) lifting the stay and directing the parties to file briefing with respect to two issues: (1) whether the Amendments are entitled to deference; and (2) whether the court should apply the Amendments retroactively to the reclassification at issue in the context of resolving the parties' competing summary judgment motions. The court heard oral argument regarding the two issues on November 1, 2005 and took the matter under advisement.

## III.   STANDARD OF REVIEW

A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 180 (3d Cir.1999). Thus, a trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If a moving party has demonstrated the absence of a genuine issue of material fact – meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole – concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby*, 477 U.S. at 256-57 (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving

5

party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

## IV. DISCUSSION

Before the court can consider the parties' cross-motions for summary judgment, it must determine whether it owes deference to the SEC's interpretation of Rules 16b-3 and 16b-7. Additionally, the court must determine whether the Amendments apply to the reclassification at issue in the present case.

### A. Whether the Amendments are Permissible Readings of Section 16(b)

The SEC amended Rules 16b-3 and 16b-7 in 2005 to "resolve any doubt as to the meaning and interpretation of these rules [16b-3 and 16b-7] by reaffirming the views [it has] consistently expressed previously regarding their appropriate construction." 70 Fed. Reg 46,080, 46,080 (Aug. 9, 2005). Specifically, with respect to Rule 16b-3(d), the SEC noted that the amendment was necessary "to eliminate the uncertainty generated by the *Levy v. Sterling* opinion," and to reassure insiders and issuers that non-compensatory acquisitions are included within the scope of Rule 16b-3's exemption.[3] *Id.* at 46,082; *see id.* at 46,083 (exempting "any transaction . . . involving an

---

[3] Prior to the Amendments, Rule 16b-3(d) stated:

17 C.F.R § 240.16b-3  Transactions between an issuer and its officers or directors.
. . . .

(d) Grants, awards and other acquisitions from the issuer.  Any transaction involving a grant, award or other acquisition from the issuer (other than a Discretionary Transaction) shall be exempt if:
(1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;

6

acquisition by an officer or director from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose"). Further, the SEC concluded that, because Rule 16b-3(d) "clarif[ies] regulatory conditions that applied to the[] exemptions since they became effective on August 15, 1996, [it is] available to any transaction on or after August 15, 1996 that satisfies the regulatory conditions so clarified." *Id.* at 46,080.

With respect to Rule 16b-7, the SEC stated that the *Levy* opinion "imposed upon reclassifications exemptive conditions that are not found in the language of [the rule,] and would not apply to a merger or consolidation relying upon the rule." 70 Fed. Reg. 46,080, 46, 084. Thus, the SEC proposed to amend Rule 16b-7 "to eliminate uncertainty generated by the *Levy v. Sterling* opinion," and to specify that that the rule applies to reclassifications on the same basis as mergers and consolidations.[4] *Id.* at 46,084-85. In addition, the SEC concluded that, because Rule 16b-7

---

(2) The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; provided that such ratification occurs no later than the date of the next annual meeting of shareholders; or

(3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such acquisition, provided that this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security.


[4] Prior to the Amendments, Rule 16b-7 stated:

17 C.F.R. § 240.16b-7 Mergers, reclassifications, and consolidations.

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:

"clarifies regulatory conditions that applied to th[e] exemption since it was amended effective May 1, 1991, it is available to any transaction on or after May 1, 1991 that satisfies the regulatory conditions so clarified." *Id.* at 46,080.

Here, the defendants contend that because the Amendments do not change the law but, rather, clarify what it was before, they apply to the reclassification at issue in this case. (D.I. 242, at 5.) To support their proposition, the defendants cite a number of cases, as well as the SEC's own language in the Amendments' adopting release, which refers to them as "clarify[ing]," and explains that they

---

(1) The acquisition of a security of a company, pursuant to a merger or consolidation, in exchange for a security of a company which, prior to the merger or consolidation, owned 85 percent or more of either (i) The equity securities of all other companies involved in the merger or consolidation, or in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies involved in the merger or consolidation, computed according to their book values prior to the merger or consolidation as determined by reference to their most recent available financial statements for a 12 month period prior to the merger or consolidation, or such shorter time as the company has been in existence.

(2) The disposition of a security, pursuant to a merger or consolidation, of a company which, prior to the merger or consolidation, owned 85 percent or more of either (i) The equity securities of all other companies involved in the merger or consolidation or, in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies undergoing merger or consolidation, computed according to their book values prior to the merger or consolidation as determined by reference to their most recent available financial statements for a 12 month period prior to the merger or consolidation.

(b) A merger within the meaning of this section shall include the sale or purchase of substantially all the assets of one company by another in exchange for equity securities which are then distributed to the security holders of the company that sold its assets.

(c) Notwithstanding the foregoing, if a person subject to section 16 of the Act makes any non-exempt purchase of a security in any company involved in the merger or consolidation and any non-exempt sale of a security in any company involved in the merger or consolidation within any period of less than six months during which the merger or consolidation took place, the exemption provided by this Rule shall be unavailable to the extent of such purchase and sale.

apply to any transaction occurring on or after the dates that the pre-amendment versions of the rules were adopted. (See Id. at 7-9.) Conversely, Levy contends that "the [SEC's] views as to whether its rules are legislative or interpretive are not entitled to deference" and, regardless of how labeled, the Amendments cannot be applied retroactively. (D.I. 239, at 4, 9.) Here, if the defendants are correct, and the Amendments apply to any transaction occurring after the Rules' effective dates, then the transactions at issue are exempt from section 16(b). The court, therefore, must determine whether the Amendments "establish[] an interpretation that 'changes the legal landscape.'" *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002) (citing cases); *see also Princess Cruises, Inc. v. United States*, 297 F.3d 1358, 1363 (Fed. Cir. 2005). However, prior to making that determination, the court must consider whether Congress has authorized the SEC to exempt the insider short-swing transactions at issue from section 16(b) liability and, if so, whether the SEC's interpretation of its own rules is a permissible reading of section 16(b).

Section 16(b) of the Act imposes liability for "short-swing" profits – that is – it forbids an insider's speculative short-term trading based upon insider information. "Its purpose is to prevent corporate insiders from exploiting material information about the issuer to have an advantage over others with whom they trade." *Bruh v. Bessemer Venture Partners III L.P.*, No. 03 Civ. 7340(GBD), 2005 WL 2087803, at * 3 (S.D.N.Y. Aug. 29, 2005) (citing *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)). Section 16(b) provides, in pertinent part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of the issuer . . . within a period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction. . . . *This subsection shall not be construed to cover . . . any*

9

> *transaction or transactions which the [SEC] by rules and regulations may exempt*
> *as not comprehended within the purpose of this subsection.*

15 U.S.C. § 78p(b) (2004) (emphasis added).  Accordingly, the text of section 16(b) demonstrates

that Congress gave the SEC broad authority, which includes the authority to promulgate binding

legal rules to exempt certain insider transactions from section 16(b)'s reach.  In view of this broad

authority, the court will apply the analysis set forth in *Chevron U.S.A. Inc. v. Natural Resources*

*Defense Council, Inc.*, 467 U.S. 837 (1984) to the SEC's interpretation of its rules exempting

transactions from section 16(b).

In *Chevron*, the Supreme Court espoused a two-step framework for courts to follow when

reviewing an agency's actions.  The court must first determine "whether Congress has directly

spoken to the precise question at issue."  *Appalachian States Low-Level Radioactive Waste*

*Commission v. O'Leary*, 93 F.3d 103, 108 (3d Cir. 1996) (citing *Chevron*, 467 U.S. at 842-43).  If

the court's answer is "no," meaning that Congress has not directly spoken to the issue, then "the

question for the court is whether the agency's answer is based on a permissible construction of the

statute."  *Appalachian States*, 93 F.3d at 108 (citation omitted).  If the court finds that it is, it must

give deference to that interpretation.  "If Congress 'explicitly left a gap for an agency to fill . . . a

court may not substitute its own construction of a statutory provision for a reasonable interpretation

made by the administrator of an agency.'"[5] *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297

F.3d 273, 281 (3d Cir. 2002).

Moreover, "[a] court's prior judicial construction of a statute trumps an agency construction

otherwise entitled to *Chevron* deference *only if the prior court decision holds that its construction*

---

[5] *Chevron* analysis also applies to an agency interpretation contained in a regulation.
*Christensen v. Harris County*, 529 U.S. 576, 587 (2000).

*follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.*"

*Nat'l Cable & Telecomm. Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (emphasis

added).  This is because "*Chevron* established a 'presumption that Congress, when it left ambiguity

in a statute meant for implementation by an agency, understood that the ambiguity would be

resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess

whatever degree of discretion the ambiguity allows.'" *Id.*  (citing *Smiley v. Citibank (South Dakota),*

*N.A.*, 517 U.S. 735, 740-41 (1996)).  Therefore, "[o]nly a judicial precedent holding that the statute

unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency

to fill, displaces a conflicting agency construction." *Brand X*, 545 U.S. at 982-83.

Here, as previously mentioned, Congress explicitly afforded the SEC the authority to exempt

transactions from the reach of section 16(b).  Therefore, section 16(b) does not unambiguously

foreclose the SEC's interpretation but, rather, requires the SEC to interpret which transactions are

exempt from its application.  *See Levy*, 314 F.3d at 112 ("As we have indicated, section 16(b)

explicitly authorizes the SEC to exempt 'any transaction . . . as not comprehended within the purpose

of' the statute.  This section is critical, for courts defer to an agency's interpretation of statutes,

particularly where the statute provides the agency with authority to make the interpretation.")  In

other words, Congress did not speak to the precise question at issue, but explicitly left a gap for the

SEC to fill.  The SEC filled this gap by promulgating rules exempting certain transactions.  As the

Third Circuit noted in *Levy*, however, "the SEC [rules did] not set forth [the SEC's] interpretation

[of section 16(b)] clearly." *Id.*  Thus, the court endeavored to determine the proper interpretation

of those rules.  Noteworthy, however, is the fact that the Third Circuit did not hold that its

interpretation of the SEC Rules was derived from the unambiguous language of either section 16(b)

or Rules 16b-3 and 16b-7.[6]  In response to the Third Circuit's criticism of its lack of clarity in the

interpretation of section 16(b), the SEC released the Amendments to "resolve any doubt as to the

meaning and interpretation of these rules [Rules 16b-3 and 16b-7]."  70 Fed. Reg. 46,080, 46,081.

Accordingly, because the Third Circuit did not conclude that section 16(b) unambiguously foreclosed

the SEC's interpretation as set forth in the Amendments, its ruling in the *Levy* case does not displace

that interpretation.  The court, therefore, must apply the second prong of the *Chevron* analysis to

determine whether the Amendments are based on a permissible construction of section 16(b).

Here, the legislative history and purpose of the statute support the SEC's interpretations set

forth in the Amendments.  The clear aim of the section was "the general evil of officers and directors

rigging their stock up and down squeezing out their own stockholders."  Interpretive Release on

Rules Applicable to Insider Reporting and Trading, Release No. 34-18114, 46 Fed. Reg. 48,147

(Sept. 24, 1981) (quoting Stock Exchange Practices, Report of the Committee on Banking and

Currency, S. Rep. No. 1455, 73rd Cong., 1st Sess., pt. 15, at 6559 (1934)).  In *Levy*, the Third Circuit

noted that the Supreme Court has also explained the purpose of section 16(b):

> The general purpose of Congress in enacting s[ection] 16(b) is well known. . . .
> Congress recognized that insiders may have access to information about their
> corporations not available to the rest of the investing public.  By trading on this
> information, these persons could reap profits at the expense of less well informed
> investors.  In s[ection] 16(b) Congress sought to 'curb the evils of insider trading (by)
> . . . taking the profits out of a class of transactions in which the possibility of abuse

---

[6] Levy seems to suggest otherwise, arguing that the Amendments cannot overrule the
Third Circuit's "mandate" in *Levy*.  (D.I. 247, at 10-11.)  What Levy fails to appreciate, however,
is the Third Circuit's guidance with respect to issues of interpretation, set forth in *United States
v. Marmolejos*, for example, in which Judge Rendell stated "[w]here a prior panel of this court
has interpreted an ambiguous statute in one way, and the responsible administrative agency later
resolves the ambiguity another way, this court is not bound to close its eyes to the new source of
enlightenment."  140 F.3d 488, 493 (3d Cir. 1998).  Consequently, Levy's arguments to the
contrary with respect to deference to administrative agency interpretations are misguided.

was believed to be intolerably great.' . . . It accomplished this by defining directors, officers, and beneficial owners as those presumed to have access to inside information and enacting a flat rule that a corporation could recover the profits these insiders made on a pair of security transactions within six months.

314 F.3d at 110 (quoting *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243-44 (1976)).[7]  Based on the Senate Committee's observations and the Supreme Court's explanation, the court finds that the central purpose behind section 16(b) was to curb insider trading, which "is rooted in inequality of information between persons who are aware of it and the persons they transact with."  70 Fed. Reg. 46,080, 46083.  Stated another way, the unfair use of information that Congress desired section 16(b) to remedy was the use of information known by officers and directors, but not by investors, to the disadvantage of uninformed investors.

As the SEC explains in both the adopting release to the 1996 amendment to Rule 16b-3 and the current Amendments, the inequality of information that section 16(b) was designed to remedy "generally does not exist when an officer or director acquires securities from, or disposes of them to, the issuer."  70 Fed. Reg. 46,080, 46,083; *see* Ownership Reports and Trading by

---

[7] Further, the Senate Committee that considered the bill which became section 16(b) observed the following:

> [a]mong the most vicious practices unearthed at the hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their *market activities*.  Closely allied to this type of abuse was the unscrupulous employment of inside information by large stockholders who, while not directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others.

Interpretive Release on Rules Applicable to Insider Reporting and Trading, Release No. 34-18114, 46 Fed. Reg. 48,147 (Sept. 24, 1981) (quoting Stock Exchange Practices, Report of the Committee on Banking and Currency, S. Rep. No. 1455, 73rd Cong., 2d Sess., at 55 (1934)) (emphasis added).

Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-37260, 61 Fed.

Reg. 30,376, 30,377 (June 14, 1996). Indeed, the 1996 amendment focused on the distinction

between issuer and officer/director transactions, and market transactions by officers and

directors, explaining that "where the issuer, rather than the trading markets, is on the other side of

an officer or director's transaction in the issuer's equity securities, any profit obtained is not at

the expense of uninformed shareholders and other market participants of the type contemplated

by the statute." 61 Fed. Reg. 30,376, 30,377. The SEC then concluded that its experience with

section 16 "persuaded [it] that transactions between the issuer and its officers and directors that

are pursuant to plans . . . that satisfy . . . objective gate-keeping conditions are not vehicles for the

speculative abuse that section 16(b) was designed to prevent," and exempted those transactions

under Rule 16b-3. *Id.* After exempting transactions between an issuer and its officers and

directors, the SEC explained that transactions with issuer-sponsored employee benefit plans

would be treated as issuer to officer/director transactions and, further, that they "need not be

pursuant to an employee benefit plan or any compensatory program to be exempt, nor need [they]

specifically have a compensatory element." *Id.* at 30,378-79. The SEC made these revisions to

Rule 16b-3 in 1996, in order "to align better the regulatory requirements under the rule with the

statutory goals underlying section 16," and intended them, in part, "to streamline the section 16

regulatory scheme, particularly with respect to transactions between an issuer and its officers and

directors . . . [and] broaden exemptions from short-swing profit recovery where consistent with

the statutory purpose." 61 Fed. Reg. 30,376, 30,376, 30,380.

     The Amendment to Rule 16b-3 reiterates the purpose behind and legislative

contemplation that went into section 16(b). 70 Fed. Reg. 46,080, 46,081-82. More important,

however, is the fact that the Amendment reaffirms the SEC's earlier conclusion that transactions between an issuer and its officers and directors are not the type of "insider" transactions contemplated by section 16(b), and need not have a compensatory element to qualify for exemption under Rule 16b-3(d). *Id.* at 46,083.

The SEC also has interpreted that reclassifications fall outside the evils that section 16(b) was designed to protect against. In 1981, the SEC issued a release in which it interpreted its rules under section 16(b). *See* Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 34-18114, 46 Fed. Reg. 48,147 (Oct. 1, 1981). The SEC issued the interpretive release because it had been receiving a number of similar questions regarding the provisions of the rules promulgated under section 16. *See id.* at 48,147. In the release, the SEC states that the exemption under Rule 16b-7 "is based on the premise that [the exempted] transactions are of relatively minor importance to the stockholders of a particular company and do not present significant opportunities to insiders to profit by advance information. . . ." *Id.* at 48,176. One of the questions that the SEC addressed in the release was whether Rule 16b-7 applied to reclassifications, even though they weren't specifically mentioned in the text of the rule. *Id.* at 48,176-77 (Question 142). It concluded that, because Rule 16b-7 "does not require that the security received in exchange be similar to that surrendered," it "can apply to transactions involving reclassifications." *Id.* at 48,177.

In 1991, the SEC made revisions to Rule 16b-7, adding the word "reclassifications" to the title of the rule, but explaining that the amendment was not intended to make any substantive change. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242, 7262-63, 7273 (Feb. 21,

15

1991).  In 2002, the SEC expressly stated that corporate reclassifications were exempt from 16(b) liability under Rule 16b-7.  *See* Form 8-k Disclosure of Certain Management Transactions, Release Nos. 33-8090, 34-45742, 67 Fed. Reg. 19,914, 11,919 n. 56 ("These [acquisitions or dispositions pursuant to holding company formations and similar corporate reclassifications and consolidations] are the transactions exempted from section 16(b) short-swing profit recovery by Exchange Act Rule 16b-7.")

The current Amendment to Rule 16b-7 reaffirms the SEC's prior position on reclassifications, as voiced in the 1981, 1991, and 2002 releases.  The Amendment also notes that, similar to a merger exempted by the rule, a reclassification "effects no major change in the issuer's business or assets."  70 Fed. Reg. 46,080, 46,084 (illustrating that reclassifications are similar to mergers exempted by Rule 16b-7, in that an issuer "could effect a reclassification by forming a wholly-owned 'shell' subsidiary, merging the issuer into the subsidiary, and exchanging securities for the issuer's securities").  Finally, the Amendment reaffirms that reclassifications, "which do not involve a substantial change in the business owned, do not involve the holders' payment of consideration in addition to the reclassified class or series of securities, and have the same effect on all holders of the reclassified class or series, do not present insiders the significant opportunities to profit by advance information that [s]ection 16(b) was designed to address."  70 Fed. Reg. 46,080, 46,085.

Given the foregoing analysis, the court finds that the Amendments are permissible readings of the statute and further concludes that they 'bear[] a fair relationship to the language of the statute, reflect[] the views of those who sought its enactment, and match[] the purpose they articulated."  *Appalachian States*, 93 F.3d at 110.  As such, this court may not substitute its

judgment for the SEC's judgment.  Therefore, the only issues remaining for the court to

determine are whether the amended or pre-amendment Rules 16b-3 and 16b-7 apply to the

transactions at issue in the present case, which occurred in 1999 and 2000, and whether any party

is entitled to summary judgment.

### B.      Retroactivity

Levy contends that even if the court labels the Amendments interpretive rules, applying

them to the case at bar is impermissible under the retroactivity doctrine.  (See D.I. 247, at 10.)

"Retroactivity is not favored in the law."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208

(1988).  Thus, "congressional enactments and administrative rules will not be construed to have

retroactive effect unless their language requires this result."  *Id.*  However, not every change in an

administrative rule effects such a change that it will be considered as operating retroactively.

The Supreme Court has stated in *Landgraf v. USA Film Products* that:

> [a] statute [or rule] does not operate "retrospectively" merely because it is applied
> in a case arising from conduct antedating the statute's [or rule's] enactment . . . or
> upsets expectations based in prior law.  Rather, the court must ask whether the
> new provision attaches new legal consequences to events completed before its
> enactment.  The conclusion that a particular rule operates "retroactively" comes at
> the end of a process of judgment concerning the nature and extent of the change in
> the law and the degree of connection between the operation of the new rule and a
> relevant past event.

511 U.S. 244, 269-70 (1994) (internal citations and footnote omitted).  Following this

pronounced standard, the court must determine whether the Amendments "take[] away or

impair[] vested rights acquired under the existing laws, or create[] a new obligation, impose[] a

new duty, or attach[] a new disability, in respect to transactions or considerations already past."

*Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1362 (Fed. Cir. 2005).  Put another way,

17

the court must consider more than the mere fact that a change or amendment has occurred – it must also consider "the nature and extent of the change in the law." *Id.* at 1363 (citing *Landgraf*, 511 U.S. at 270). "The strongest indication of a substantive change is inconsistency with a previously stated position." *First Nat'l Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 479 (7th Cir. 1999).

The Amendment to Rule 16b-3(d) is now titled "Acquisitions from the issuer," and adds the words "whether or not intended for a compensatory or other particular purpose."[8] 17 C.F.R. § 240.16b-3 (2005). The Amendment to Rule 16b-7 adds the word "reclassification" to the terms

---

[8] The current version of Rule 16b-3(d) reads as follows, with the new language underlined:

17 C.F.R § 240.16b-3  Transactions between an issuer and its officers or directors.
. . . .

> (d) <u>Acquisitions from the issuer</u>.  Any transaction, other than a Discretionary Transaction, involving an acquisition from the issuer (<u>including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose</u>, shall be exempt if:
> (1) The transaction is approved by the board of directors of the issuer, or a committee of the board of directors that is composed solely of two or more Non-Employee Directors;
> (2) The transaction is approved or ratified, in compliance with section 14 of the Act, by either: the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer is incorporated; or the written consent of the holders of a majority of the securities of the issuer entitled to vote; provided that such ratification occurs no later than the date of the next annual meeting of shareholders; or
> (3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such acquisition, provided that this condition shall be satisfied with respect to a derivative security if at least six months elapse from the date of acquisition of the derivative security to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security.

merger or consolidation that appear in the pre-amendment version of the rule. 17 C.F.R.

240.16b-7 (2005). It also adds the phrase "[t]he exemption provided by this section applies to

any securities transaction that satisfies the conditions specified in this section and is not

conditioned on the transaction satisfying any other conditions."[9] 17 C.F.R. 240.16b-7. As

---

[9] The current version of Rule 16b-7 reads as follows, with the new language underlined:

17 C.F.R. § 240.16b-7 Mergers, reclassifications, and consolidations.

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:
(1) The acquisition of a security of a company, pursuant to a merger, reclassification, or consolidation, in exchange for a security of a company that before the merger, reclassification, or consolidation, owned 85 percent or more of either: (i) The equity securities of all other companies involved in the merger, reclassification, or consolidation, or in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies involved in the merger, reclassification, or consolidation, computed according to their book values before the merger, reclassification, or consolidation as determined by reference to their most recent available financial statements for a 12 month period before the merger, reclassification, or consolidation, or such shorter time as the company has been in existence.
(2) The disposition of a security, pursuant to a merger, reclassification, or consolidation, of a company that before the merger, reclassification, or consolidation, owned 85 percent or more of either (i) The equity securities of all other companies involved in the merger, reclassification, or consolidation or, in the case of a consolidation, the resulting company; or (ii) The combined assets of all the companies undergoing merger, reclassification, or consolidation, computed according to their book values before the merger, reclassification, or consolidation as determined by reference to their most recent available financial statements for a 12 month period before the merger, reclassification, or consolidation.
(b) a merger within the meaning of this section shall include the sale or purchase of substantially all the assets of one company by another in exchange for equity securities which are then distributed to the security holders of the company that sold its assets.
(c) The exemption provided by this section applies to any securities transaction that satisfies the conditions specified in this section and is not conditioned on the transaction satisfying any other conditions.
(d) Notwithstanding the foregoing, if a person subject to section 16 of the Act makes any non-exempt purchase of a security in any company involved in the merger,

previously noted, the SEC made these revisions to remove any doubt as to the nature and scope

of transactions exempted from section 16(b) short-swing profit recovery by Rules 16b-3 and 16b-

7. 70 Fed. Reg. 46,080, 46,081. Levy argues that even though the SEC refers to the

Amendments as clarifying, they are not clarifying but, instead, legislative rules effecting

substantive changes in the law. (D.I. 239, at 4-5.) An examination of the SEC's previously

stated position, however, reveals that it is consistent with the Amendments. In other words, the

Amendments do not change the legal landscape with respect to exemptions under section 16(b).

The SEC's position appears in the previously-discussed adopting releases to Rules 16b-3 and

16b-7, as well as several persuasive no-action letters authored by SEC staff, which the court now

addresses.

On January 12, 1999, the SEC issued a No-Action Letter to Skadden, Arps, Slate,

Meagher & Flom LLP (the "Skadden Letter") regarding the application of Rule 16b-3 to

transactions occurring in the context of corporate mergers. *See* Skadden, Arps, Meagher & Flom

LLP, SEC No-Action Letter, 1999 WL 11540 (Jan. 12, 1999). In this letter, the SEC interpreted

Rule 16b-3(d) to exempt "the acquisition of acquiror equity securities (including acquiror

derivative securities) by officers and directors of the acquiror through the conversion of target

equity securities in connection with a merger." *Id.* at *1. The transaction described in the letter

is a transaction outside of the compensatory context, and one that the SEC concluded would be

---

reclassification, or consolidation and any non-exempt sale of a security in any
company involved in the merger, reclassification, or consolidation within any period
of less than six months during which the merger, reclassification, or consolidation
took place, the exemption provided by this section shall be unavailable to the extent
of such purchase and sale.

exempt under Rule 16b-3(d). Accordingly, the Skadden Letter provides persuasive support for the defendants' position that the Amendments effected no change in the application of Rule 16b-3.[10]

Similarly, the SEC's No-Action Letters to Monk-Austin, Inc. ( "Monk-Austin") and St. Charles Acquisition Limited Partnership ("St. Charles") demonstrate that the SEC had interpreted Rule 16b-7 to apply to reclassifications. *See Monk-Austin, Inc.*, No-Action Letter, 1992 WL 337451 (Nov. 19, 1992); *St. Charles Acquisition Ltd. P'ship*, No-Action Letter, 1992 WL 146565 (June 25, 1992). In the Monk-Austin letter, the company seeking the SEC's advice planned to effect a recapitalization in which a new class of common stock would be created, and all outstanding shares of capital stock would be converted into shares of common stock. *Monk-Austin*, 1992 WL 337451, at *1. Monk-Austin asked the SEC to concur in its view that the receipt of common stock in the recapitalization would be exempt under Rule 16b-7. *Id.* at * 2. Monk-Austin set forth its understanding of the types of transactions that Rule 16b-7 exempts:

> The Staff has long recognized that Rule 16b-7, which exempts mergers and other transactions in which securities received in the transaction are issued by a company that owned 85% of all other companies involved in the transaction, is designed to exempt transactions that are subject to little abuse by insiders and "do not significantly alter in an economic sense the type of security which the insider held prior to the transaction." In the [September 23,] 1981 [SEC] Release, the Staff took the position that Rule 16b-7 could apply to transactions structured as reclassifications if all other conditions of the rule were satisfied.

---

[10] The court is also persuaded by the opinion in *Gryl v. Shire Pharmaceuticals Group PLC*, in which the United States Court of Appeals for the Second Circuit held that Rule 16b-3(d) exempted acquiror directors' acquisitions and sales of acquiror options upon conversion of their target options in a corporate merger. *See* 298 F.3d 136, 145-46 (2d Cir. 2002) ("So long as the relevant securities transaction is between an issuer and insider, and so long as the terms and conditions of that transaction receive advance approval by the board of directors, there exists sufficient protection to ensure that any short-swing profit taking that follows is not the result of unfair market manipulation.")

*Id.* at * 3 (citations omitted).  Monk-Austin then posited that "[t]he acquisition by the Company's shareholders of shares of Common Stock should be exempt from Section 16(b) by virtue of Rule 16b-7," because "the recapitalization is effected to change the capital structure in preparation for an IPO and not to change the economic or other nature of their investment in the Company."  *Id.* The SEC determined that the Monk-Austin transaction would be exempt under Rule 16b-7.  In St. Charles, the partnership involved sought guidance regarding Rule 16b-7 exemptions.  *St. Charles*, 1992 WL 146565, at * 1.  After analyzing the facts presented, the SEC concluded that the partnership's restructuring would be exempt under Rule 16b-7, because the proportionate interest of the shareholders was unchanged by the transaction.  *Id.* at *4 (noting that the proposed restructuring is "within the spirit and intent of Rule 16b-7").  The foregoing analysis, as well as the courts discussion of the Rule 16b-3 and Rule 16b-7 adopting releases, demonstrate that the Amendments are consistent with the SEC's previously-stated positions regarding these rules.  As such, the court concludes that the Amendments are not substantive changes in the law.

Levy also argues that the Amendments effect substantive changes in the law because they "rewrit[e]" Rules 16b-3(d) and 16b-7.  (D.I. 239, at 6.)  The court is not persuaded.  A change in the text of a regulation does not necessarily denote a substantive change.  *See United States v. Marmolejos*, 140 F.3d 488, 492 (3d Cir. 1998); *Homemakers North Shore, Inc. v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987) (noting that "[n]ew language need not imply new substance").  Moreover, the court believes that focusing its analysis on the fact that the text of the rule has changed would be a mistake.  Instead, the proper focus should be on the effect of the change in the text of the rule.  In the present case, as previously noted, the Third Circuit in *Levy* found the SEC's interpretations of the pre-amendment versions of Rules 16b-3 and 16b-7 less than clear.

22

*See Levy*, 314 F.3d at 112 ("the SEC has not set forth its interpretation [of section 16(b)]

clearly"); *id.* at 114 ("In the absence of specific SEC guidance about which reclassifications are

exempt from section 16(b) under Rule 16b-7, we believe that two principles should guide us.")

The SEC, therefore, undertook to remove any doubt as to the meaning of those rules by

amending them, but did not change its prior interpretation of the rules. Accordingly, as the court

has already concluded above, the legal effect of the amended rules is the same as the legal effect

of the pre-amendment rules. That is, despite the differences between the text of the Amendments

rules and the pre-amendment rules, the SEC has consistently provided only one position with

respect to Rules 16b-3 and 16b-7. *See First Nat'l Bank*, 172 F.3d at 479.[11] Therefore, the court

concludes that the Amendments are clarifying amendments available to any transaction on or

after August 15, 1996 and May 1, 1991, for rules 16b-3 and 16b-7, respectively.

### C.    Summary Judgment

Levy, National, and Sterling have filed cross-motions for summary judgment in this case.

National and Sterling contend in their respective motions that, when shares are acquired as the

result of a reclassification, the transaction cannot be considered a purchase for section 16(b)

purposes, because it is exempt under Rule 16b-7. Additionally, Sterling argues that the

reclassification is exempt under Rule 16b-3(d). Conversely, Levy argues that neither exemption

---

[11] Levy advances a number of other arguments as to why the Amendments effect substantive changes in the law, including: (1) the length of time that elapsed from the initial adoptions of the Rules and the Amendments (D.I. 239, at 6 or 7 op br); (2) the length of time that elapsed from the publishing of the Amendments to their adoption (Id. at 7); (3) the fact that the Amendments were adopted by a notice and comment period (Id. at 6-7); and (4) the fact that the SEC invoked its legislative authority in proposing the Amendments (Id. at 8). These arguments may be an attempt to divert the court from the real task at hand, which is determining, as it has, whether the Amendments change the nature and extent of the law. Thus, the court will not consider them in its analysis.

to section 16(b) applies to the transactions at issue in the present case. Levy, however, has acknowledged that the defendants would be entitled to summary judgment if the Third Circuit had adopted the SEC's interpretation of Rules 16b-3 and 16b-7. (D.I. 143, at 5 ("It is no secret that if the Third Circuit had adopted the SEC's position that this litigation would have been over – Defendants would have won as a matter of law and there would have been no need for additional proceedings beyond affirming the District Court's original decision.")); *See* Tr. at 5:11-22 (standing by position that the defendants would have won if the SEC position was adopted by the Third Circuit).

The elements of a claim under section 16(b) are that "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998). The only element that the parties dispute here is whether the reclassification transactions upon the conversion of the preferred stock into common stock were non-exempt purchases under section 16(b) of the Act. Having already determined that it should defer to the SEC's interpretations of Rules 16b-3(d) and 16b-7 in the Amendments, which provide that the reclassification transactions at issue are exempt because they are not within the purview of section 16(b), the court concludes that no genuine issue of material fact exists in the present case. Accordingly, the defendants are entitled to judgment as a matter of law.[12]

---

[12] Because the court has determined that the defendants are entitled to summary judgment based on Rules 16b-3(d) and 16b-7, it need not consider their alternative legal theories for summary judgment.

## IV.     CONCLUSION

For the aforementioned reasons, the defendants' motion will be granted and the plaintiff's motion will be denied.



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARK LEVY,                                )
                         Plaintiff,        )
                                          )
              v.                          )
                                          )
STERLING HOLDING COMPANY, LLC, )          C.A. No. 00-994
NATIONAL SEMICONDUCTOR          )
CORPORATION and FAIRCHILD       )
SEMICONDUCTOR INTERNATIONAL,    )
INC,                            )
                         Defendants.       )

**ORDER**

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY

ORDERED that:

1.    The plaintiff's Motion for Summary Judgment (D.I. 119) is DENIED.

2.    The defendant National's Motion for Summary Judgment (D.I. 122) is GRANTED.

3.    The defendant Sterling's Motion for Summary Judgment (D.I. 125) is GRANTED.

4.    Judgment is hereby entered in favor of the defendants, National and Sterling.

5.    The Clerk of Court is directed to close this case.

Dated: February 23, 2007

_____
UNITED STATES DISTRICT JUDGE



FILED

FEB 2 3 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE